Filed 5/28/13  P. v. Meredith CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>THOMAS ALLEN MEREDITH,<br><br>Defendant and Appellant. | B234698<br><br>(Los Angeles County<br>Super. Ct. No. VA113133) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Higa, Judge.  Reversed and remanded.

Helen Simkins Irza, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Thomas Allen Meredith was convicted by a jury of possession of ammunition by a felon and possession of a controlled substance for sale (methamphetamine), items that were discovered in the course of a search pursuant to warrant, and one count of possession of a controlled substance (methamphetamine) discovered in a later arrest. He was sentenced to a state prison term of four years. On appeal Meredith contends the affidavit submitted in support of the warrant contained intentional and material misstatements of fact and that in ruling on his motion to traverse the search warrant the trial court improperly conducted an in camera hearing pursuant to *People v. Hobbs* (1994) 7 Cal.4th 948 (*Hobbs*), rather than a contested evidentiary hearing pursuant to the United States Supreme Court's decision in *Franks v. Delaware* (1978) 438 U.S. 154 [98 S.Ct. 2674, 57 L.Ed.2d 667] (*Franks*). He also contends the court committed instructional error. We reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Warrant*

On November 24, 2009 Los Angeles County Sheriff's Detective Gilbert Arakawa sought and was issued a warrant to search Meredith's Whittier residence and a storage unit in La Habra based on information indicating Meredith, a felon, was engaged in the sale of methamphetamine and was in illegal possession of a firearm. In support of the required showing of probable cause, Arakawa submitted an affidavit, based on his personal knowledge, stating he had been contacted by two persons familiar with firearms and the sale of illegal narcotics (one identified as a confidential reliable informant (CRI) and the other as a confidential informant (CI)) who told Arakawa that Meredith was supplying street level drug dealers with methamphetamine and was concealing the drugs in the bed of his pickup truck. The CI also told Arakawa that Meredith sometimes concealed the drugs in the engine compartment of his truck or in hidden compartments sewn into the front of his pants when he left the truck and that he spoke frequently and passionately about his .45 caliber semiautomatic handgun.

In addition, the affidavit stated Detective Arakawa had initiated surveillance of Meredith's residence on November 19, 2009. That afternoon, he saw Meredith conceal a

2

grocery bag in the bed of his truck. Two hours later Arakawa followed Meredith, driven by his brother in a different truck, to a storage facility where Meredith entered a unit while his brother waited in the truck. On November 23, 2009 Arakawa watched Meredith enter his motor home, which was parked in front of the house, holding a flashlight. Inside the motor home, Meredith held up a gallon-sized plastic bag containing five to six separately packaged racquetball-sized balls of a white substance that resembled methamphetamine. Arakawa, who was located 150 feet away from the motor home and was using binoculars, stated he was able to view the contents of the bag because it had been illuminated by Meredith's flashlight. Meredith then entered the garage of the house, cradling something in his arm, and returned to the truck a few minutes later. He looked around, reached into the front of his shorts and then reached into the bed of the truck. Half an hour later Meredith left in his truck and drove to a shopping mall. He circled the lot and parked, staying in his truck for about 15 minutes. When he got out of the truck, he reached into the bed of the truck and then placed his hand in the front of his shorts. He then entered the mall. Meredith came out about an hour later, carrying several large shopping bags, which he placed in the cab of the truck. He reached into his shorts again and placed something in the bed of the truck, after which he returned home.

2. *Execution of the Warrant*

Sheriff's deputies executed the warrant immediately after it was issued. At the Whittier house where Meredith resided with his mother,[1] deputies found a small container in the living room holding 1.31 grams of methamphetamine, a rifle and some ammunition, a paper plate with .58 grams of methamphetamine on it, a small digital scale with a white residue on the plate, two small plastic bags containing a total of 4.68 grams of methamphetamine and $2,738 in cash. In Meredith's truck deputies found two boxes of plastic sandwich bags, a piece of paper entitled "owe sheet," a pair of brass knuckles and a receipt for payment to the storage facility. In the motor home deputies found a

---

[1] Meredith presented evidence at trial that he had not been living at the house, but this evidence is not relevant to our analysis.

small digital scale covered with a white residue and marijuana. At the storage locker deputies found a container holding 2.31 grams of methamphetamine, a shoe box containing .12 grams of methamphetamine, some documents bearing Meredith's name and two bullet-proof vests they determined to be at least 10 years old. Meredith himself was searched after his arrest. He was carrying $800 in cash but no methamphetamine.

Meredith was released on bail after his arrest. A week later, on December 1, 2009, Detective Arakawa and Deputy Ted Cariasco saw Meredith standing next to his truck and spoke to him. Arakawa saw Meredith throw something on the ground and told Meredith to put his hands on the patrol car. Arakawa searched Meredith and found a glass pipe and .87 grams of methamphetamine in a plastic bag in Meredith's pocket. Arakawa found on the ground a number of unused one and one-half by one and one-half inch plastic jeweler's bags commonly used to package drugs for sale.[2]

3. *The Information*

Based on the seized items Meredith was charged with possession of a firearm by a felon (former Pen. Code § 12021, subd. (a)(1)[3] (now § 29800, subd. (a)) (count 1)), possession of ammunition by a felon (former § 12316, subd. (b)(1) (now § 30305) (count 2)), possession of a deadly weapon (brass knuckles) (former § 12020, subd. (a)(1) (now § 21810) (count 3)), possession for sale of a controlled substance (Health & Saf. Code, § 11378 (count 4)) and possession of body armor (former § 12370, subd. (a) (now § 31360 (count 5)). The information further specially alleged Meredith had previously suffered one prior serious felony conviction within the meaning of the "Three Strikes" law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)), one prior conviction for possession for sale of a controlled substance (Health & Saf. Code, § 11370.2, subd. (c)) and had served two prior prison terms for a felony (§ 667.5, subd. (b).)

---

[2]    According to Detective Arakawa, he found between 50 and 100 small bags on the ground. Deputy Cariasco remembered seeing only a few bags. The bags were not preserved for evidence; neither were they photographed.

[3]    Statutory references are to the Penal Code unless otherwise indicated.

4

The possession for sale count was amended before trial to add a firearm enhancement (§ 12022, subd. (c)). In addition, the People filed a second felony complaint against Meredith alleging one count of possession of a controlled substance (Health & Saf. Code, § 11370, subd. (a)) based on his second arrest while on bail, which was included as count 6 in an amended information.

4. *The Motion To Suppress*

Meredith initially moved to quash the search warrant and to suppress the evidence seized pursuant to the warrant. (§ 1538.5, subd. (a)(1)(B).) The trial court denied the motion, citing Detective Arakawa's statement he had observed Meredith in the motor home handling a bag that appeared to contain methamphetamine or cocaine. Meredith then moved to traverse the warrant,[4] challenging Arakawa's claim he had seen Meredith handling drugs inside the motor home from a distance of 150 feet. In scheduling an evidentiary hearing on the motion to traverse, the trial court advised counsel the hearing would be conducted in camera. Meredith filed additional briefing protesting the decision to conduct the hearing in camera on the ground the affidavit in support of the warrant had not been sealed and he was not challenging statements attributed to the confidential informants or seeking to learn their identity. In support of the motion Meredith submitted a declaration stating he had not driven the motor home in the three days before his arrest and the vehicle had been parked on the street with blinders covering the front windshield during that time. His mother and a neighbor confirmed these statements in separate declarations. Meredith also submitted photographs of the motor home without the blinders to demonstrate the difficulty a passerby would have seeing into the vehicle.[5]

---

[4]     A motion to quash challenges the facial validity of the warrant. A motion to traverse attacks the underlying veracity of the statements made on the face of the search warrant application (sometimes called a "subfacial" challenge). (*People v. Heslington* (2011) 195 Cal.App.4th 947, 958.)

[5]     Meredith also challenged Detective Arakawa's affidavit for omitting any mention of Meredith's activities on the night he was followed to the shopping mall. According to Meredith, his mother worked for J.C. Penney and he accompanied her on the employees' shopping night in anticipation of the holidays. To help his mother, he then carried the

The evidentiary hearing was conducted on December 7, 2010.  The trial court denied Meredith's renewed objection to a closed hearing, ruling the existence of confidential informants required the court to conduct the hearing in camera to assess the ultimate showing of probable cause.  The court pointedly rejected the suggestion by Meredith's counsel that an in camera hearing would not adequately protect her client's interests and declined to open the hearing on issues unrelated to the informants.

Detective Arakawa and his supervisor, Lieutenant James Tatreau, attended the hearing and were questioned by the court.  After the hearing the court denied the suppression motion, announcing there had been probable cause to issue the warrant and the affidavit did not contain material omissions or misstatements.  The transcript of the hearing was sealed.

5.  *Trial*

Lieutenant Tatreau, rather than Detective Arakawa, testified at trial regarding the surveillance conducted of Meredith.  Tatreau testified he saw Meredith's brother drive Meredith to the storage unit and on several occasions saw Meredith enter the motor home parked outside the Whittier residence.  On the evening of November 23, 2009, a week into the surveillance, Tatreau watched with binoculars from a distance of approximately 50 feet as Meredith entered the dark motor home with a flashlight.  Aided by the flashlight, Tatreau testified he saw Meredith hold up a "gallon size zip-top bag containing five or six racquetball-size objects that appeared to be a white substance resembling methamphetamine or cocaine."  Tatreau further testified he was alone on the surveillance that night but relayed information about Meredith's actions to Arakawa by portable radio.

The next day Tatreau led the team conducting the search of the house and storage unit pursuant to the warrant.  As described above, the search yielded multiple small amounts of methamphetamine, a small amount of marijuana, two small scales covered with a white residue, a sheet of paper listing debts (referred to by deputies as a "pay-owe" sheet), some sandwich-sized foldover bags, a rifle and ammunition, a pair of brass

---

large shopping bags to his truck.  Meredith contended Arakawa intentionally omitted this information from the affidavit to make Meredith's activities look suspicious.

6

knuckles and $2,738 in cash. An additional $800 in cash was found in Meredith's possession, but no methamphetamine. Meredith's mother, who owned the house, was home at the time of the search. Although she initially claimed she and Meredith were the only ones living in the home, she testified her older son and granddaughter also lived there and that the gun and ammunition belonged to her older son.

Detective Arakawa also testified during the People's case but was asked no questions about the surveillance. He testified solely about Meredith's second arrest while on bail, during which Meredith was found in possession of a small amount of methamphetamine, a glass pipe and a number of small plastic bags of the type used to package illicit drugs for sale.

Sergeant Don Manumaleuna testified as an expert witness on drug sales. According to Manumaleuna, the minimum usable amount of methamphetamine is about .02 grams; about half a gram will yield 20 doses, which will last a typical user half a day although individual tolerances vary based on body size and length of use. Approximately 80 to 90 percent of the time, methamphetamine sellers also use the drug. Nine grams of methamphetamine—the cumulative amount found during the search—is worth about $360. Sellers use scales to weigh the product before packaging it in small plastic bags. Based on the amount of methamphetamine found, the cash, the rifle, the scales, the plastic bags and the pay-owe sheet, Manumaleuna opined the methamphetamine had been possessed for sale.

Meredith did not testify. One of his friends testified Meredith had been staying at his house several nights a week. Another testified he had not seen Meredith at the Whittier house the night Lieutenant Tatreau testified he had seen Meredith in the motor home. Meredith's brother, James, testified Meredith had not been living at the house and that James had been holding the rifle for a friend, to whom the weapon was registered. Because James had recently moved back to California, many of the possessions in the storage unit were his; and several people had keys to the unit. Other witnesses, including a neighbor, testified the motor home's curtains and sunscreen were always in place and had been in place when the search warrant was executed.

7

The defense called Detective Arakawa to testify concerning the surveillance. Under limitations imposed by the trial court as to questions about his location, Arakawa testified he had observed the motor home from a distance of 150 feet. He denied speaking with Lieutenant Tatreau by radio and stated they had been able to converse directly because they were within hearing range of each other, with Tatreau being slightly closer to the motor home than he was.

6. *Verdicts and Sentencing*

At the close of testimony the trial court granted Meredith's motion under section 1118.1 in part, striking the personal use of a firearm enhancement on the possession-for-sale count. The court also granted the People's motion to dismiss the possession-of-body-armor count.

The jury convicted Meredith of possession of ammunition by a felon (count 2), possession of a controlled substance for sale (count 4) and possession of a controlled substance (count 6). After deliberating for more than two days, the jury was unable to reach a verdict on the remaining counts; and the court declared a mistrial on those counts. The trial court ruled in Meredith's favor on a civil forfeiture proceeding and ordered the money returned.

Meredith stipulated to his prior felony convictions, and the court dismissed the strike allegation in the interest of justice. Meredith was then sentenced to a state prison term of four years, consisting of the upper term of three years on count 2, plus one year for the prior prison term enhancement, and concurrent four-year terms on counts 4 and 6. He was awarded two days of presentence custody credit.[6]

**CONTENTIONS**

Meredith contends the court improperly denied him an evidentiary hearing on his motion to traverse the warrant and denied his constitutional rights by conducting the hearing in camera. He also contends the trial court erred by failing to instruct the jury on the lesser included offense of simple possession of methamphetamine on count 4 and

---

[6]     Meredith contends, and the People concede, that he is entitled to three days of presentence custody credit.

8

should have given a unanimity instruction to ensure members of the jury agreed on the basis for the possession for sale count.  Meredith also seeks certain sentencing corrections.

## DISCUSSION

1.  *The Trial Court Improperly Deprived Meredith of a <u>Franks</u> Hearing on the Motion To Traverse the Warrant*

    a.  *The trial court erred by proceeding with an in camera hearing*

The warrant clause of the Fourth Amendment requires, absent certain exceptions not applicable here, that police obtain a warrant from a neutral and disinterested magistrate before commencing a search.  A warrant may not issue unless there is probable cause, as typically set forth in the warrant affidavit, to justify the search. Probable cause is established when, considering the totality of the circumstances, there is sufficient evidence to cause a reasonably prudent person to believe that a search will uncover evidence of a crime.  (*Illinois v. Gates* (1983) 462 U.S. 213, 238 [103 S.Ct. 2317, 76 L.Ed.2d 527]; see *People v. Kraft* (2000) 23 Cal.4th 978, 1040 ["[t]he question facing a reviewing court asked to determine whether probable cause supported the issuance of a warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing"].)

In *Franks, supra,* 438 U.S. 154 the Supreme Court held, when a defendant establishes by a preponderance of the evidence that an affidavit used to obtain a search warrant contained perjury or statements made with reckless disregard for the truth, the court must determine whether the remaining content of the affidavit is sufficient to establish probable cause.  If not, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."  (*Id.* at p. 156.)

To establish the right to an evidentiary hearing under *Franks*, the defendant must make a substantial preliminary showing the affidavit contains omissions or misstatements that were either intentionally made, or made with a reckless disregard for the truth, which are material to the determination of probable cause:  "There is, of course, a presumption

9

of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. . . . Affidavits or sworn or otherwise reliable statements of witnesses should be furnished. . . . Allegations of negligence or innocent mistake are insufficient. . . . [I]f these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled . . . to his hearing." (*Franks, supra,* 438 U.S. at pp. 171-172, fn. omitted; accord, *People v. Panah* (2005) 35 Cal.4th 395, 456.)

Presented with Meredith's motion to traverse the warrant, which was accompanied by three declarations and photographs challenging Detective Arakawa's sworn description of his surveillance of the motor home and his omission of Meredith's holiday shopping trip to J.C. Penney with his mother,[7] the trial court informed counsel it would not conduct a contested evidentiary hearing but would hear the matter in camera because the unsealed affidavit cited information provided by two confidential informants. The court declined to open the hearing, even after Meredith's counsel objected she was not challenging the identity of the informants and was instead challenging Arakawa's statement Meredith had been seen handling what appeared to be methamphetamine. According to the court, if

---

[7]    "Omissions are 'material' if the affidavit was rendered substantially misleading, i.e., if there was a 'substantial probability [the omitted facts] would have altered a reasonable magistrate's probable cause determination.' [Citation.] If the asserted omissions are deemed immaterial and the affidavit on its face supports probable cause, the warrant usually stands. [Citation.] [¶] If a material fact is reasonably omitted, no sanction is imposed. [Citation.] If a material fact is negligently omitted, the reviewing court should view the affidavit as if it had included that fact and retest it for probable cause. [Citation.] Lastly, if a fact is recklessly omitted or omitted with an intent to mislead, the warrant should be quashed, regardless of whether the omission is ultimately deemed material.'" (*People v. Carpenter* (1997) 15 Cal.4th 312, 363.)

10

information from a confidential informant constituted part of the showing of probable cause, the court was required to proceed in camera to determine whether probable cause existed notwithstanding the asserted misstatements. The court chastised Meredith's counsel for suggesting its own examination of the government's witnesses would be inadequate to protect Meredith's rights.

This was error. As urged by the People, we construe the court's statements to mean it believed it was required to proceed under *Hobbs, supra,* 7 Cal.4th 948, and not under *Franks*. *Hobbs* governs "[w]hen a defendant seeks to quash or traverse a warrant *where a portion of the supporting affidavit has been sealed*," typically because of information contained in the affidavit relating to a confidential informant. (*People v. Galland* (2008) 45 Cal.4th 354, 364, citing *Hobbs*, at p. 963, italics added.) Under *Hobbs* the court is required first to determine whether there are sufficient grounds for maintaining the confidentiality of the informant's identity; if so, the court should then determine whether the existing sealing of the affidavit (or any portion thereof) "is necessary to avoid revealing the informant's identity." (*Hobbs*, at p. 972.) Once the affidavit is found to have been properly sealed, the court should proceed to determine "'whether, under the "totality of the circumstances" presented in the search warrant affidavit and the oral testimony, if any, presented to the magistrate, there was "a fair probability" that contraband or evidence of a crime would be found in the place searched pursuant to the warrant' (if the defendant has moved to quash the warrant) or 'whether the defendant's general allegations of material misrepresentations or omissions are supported by the public and sealed portions of the search warrant affidavit, including any testimony offered at the in camera hearing' (if the defendant has moved to traverse the warrant)." (*Galland,* at p. 364, quoting *Hobbs,* at pp. 974, 975.) "The prosecutor may be present at the in camera hearing; the defendant and defense counsel are to be excluded unless the prosecutor elects to waive any objection to their presence. However, defense counsel should be afforded the opportunity to submit written questions, reasonable in length, which shall be asked by the trial judge of any witness called to testify at the proceeding." (*Galland*, at p. 364.)

11

Here, the affidavit not having been sealed and there having been no factual challenge to the information provided by the informants, *Hobbs* did not apply. Instead, the court should simply have assessed whether Meredith was entitled to a *Franks* hearing under the standards articulated in that case.

Notably, the People do not attempt to justify the procedure used by the trial court in this instance as a pre-*Franks* hearing, which a court may use to test the need for further inquiry. As our colleagues in Division Five of this court have explained, "the standard for compelling pre-*Franks* hearing discovery is lower than whether to allow the hearing on the merits of the suppression of evidence motion." (*People v. Estrada* (2003) 105 Cal.App.4th 783, 791.) Typically, such a procedure is employed in cases involving confidential informants. (See, e.g., *People v. Luttenberger* (1990) 50 Cal.3d 1, 21-24 (*Luttenberger*); *Estrada,* at pp. 790-791.) "'To justify in camera review and discovery, preliminary to a subfacial challenge to a search warrant, a defendant must offer evidence casting some reasonable doubt on the veracity of material statements made by the affiant. [Citations.] . . . Thus, before an in camera review may be ordered, the defendant must raise *some reasonable doubt regarding either the existence of the informant or the truthfulness of the affiant's report concerning the informant's prior reliability or the information he furnished.*'" (*Estrada*, at pp. 791-792, quoting *Luttenberger*, at pp. 22-23, citations omitted, italics added; see also *People v. Navarro* (2006) 138 Cal.App.4th 146, 165 [*Luttenberger* "established a discovery procedure where a defendant seeks to mount a *Franks* challenge to a search warrant obtained through information from a confidential informant"].)

Proceeding under *Luttenberger* in this case, however, was not an option because Meredith did not challenge the identity or reliability of a confidential informant. In the context of a pre-*Franks* hearing not involving a challenge to a confidential informant, the Seventh Circuit recently explained, "A district court that is in doubt about whether to hold a *Franks* hearing has discretion to hold a so-called 'pre-*Franks*' hearing to give the defendant an opportunity to supplement or elaborate on the original motion. Though permissible, this procedural improvisation is not without risk, as the sparse case law

12

indicates. In such a pre-*Franks* hearing, the natural temptation for the court will be to invite and consider a response from the government. However, the court should not give the government an opportunity to present its evidence on the validity of the warrant without converting the hearing into a full evidentiary *Franks* hearing, including full cross-examination of government witnesses." (*United States v. McMurtrey* (7th Cir. 2013) 704 F.3d 502, 504 (*McMurtrey*).)

In *McMurtrey* the defendant sought a *Franks* hearing based on inconsistencies between two police officer affidavits asserting probable cause with respect to neighboring houses: "On the critical issue of which of two houses should be searched, the affidavits contradicted each other." (*McMurtrey*, *supra,* 704 F.3d at p. 505.) Instead of proceeding with a full *Franks* hearing, the trial court held a "truncated pre-*Franks* hearing" and allowed the government to offer additional evidence to explain the discrepancies in the affidavits but prevented the defense from cross-examining the government witnesses and denied the motion for a *Franks* hearing. (*Ibid.*) The Seventh Circuit reversed. It concluded the trial court had acted within its discretion in holding a pre-*Franks* hearing, but noted "[t]he problem arises . . . when a 'pre-*Franks*' hearing becomes a vehicle for the government to present new evidence to explain the discrepancies identified by the defense, yet the defense is not given a full opportunity to challenge or rebut that evidence. Such government evidence is appropriate for the *Franks* hearing itself, where the defense must have the opportunity for full cross-examination." (*Id.* at p. 509; see also *United States v. Harris* (7th Cir. 2006) 464 F.3d 733, 739 [reversing denial of *Franks* hearing after allowing government to bolster its affidavits: "The opportunity to cross-examine an officer who has intentionally or recklessly made false statements to procure a search warrant in an important aspect of a *Franks* hearing"].)

We similarly reject the notion that, outside the scope defined by *Luttenberger* and *Hobbs*, a trial court can invite the People to supplement their challenged probable cause showing but then deny the defendant the opportunity to cross-examine the basis for that showing. In this case, Meredith submitted declarations that raised a reasonable doubt about the veracity of Detective Arakawa's description of the surveillance. Even

13

assuming the court believed it was conducting an appropriate pre-*Franks* inquiry, it was error to close the hearing, take new evidence (untested by the defense) and then deny a full evidentiary hearing.

        b. *Meredith met the standard for an evidentiary hearing under <u>Franks</u>*

We review denial of a *Franks* motion de novo. (*People v. Panah, supra,* 35 Cal.4th at p. 457.) Based on the declarations and photographs submitted by Meredith, we have no question he met the standard for an evidentiary hearing under *Franks*. Each of the declarations (one from Meredith; one from his mother; and one from a neighbor) stated the windows of the motor home had been screened on the night of the surveillance. In addition, through photographs taken at various distances from the motor home with the windows uncovered, Meredith challenged the physical possibility of a person located 150 feet away—even when using binoculars—being able to view someone inside the motor home handling a plastic bag the observer could reliably conclude contained a drug-like substance. The judge who ruled on Meredith's facial challenge to the affidavit's showing of probable cause expressly relied on Detective Arakawa's assertion he saw Meredith handling a bag containing balls of drug-like substances, thus making this the critical component of the probable cause showing. (See, e.g., *McMurtrey, supra,* 704 F.3d at p. 513 ["the apparently false information went to the heart of probable cause for the search"].)

Absent Detective Arakawa's description of Meredith handling what appeared to be a controlled substance, the remaining portions of the affidavit, including the information allegedly provided by confidential informants, failed to establish probable cause. (See *Franks, supra,* 438 U.S. at p. 172.) Of the two confidential informants described, only one is labeled "reliable." The affidavit, moreover, contains no information about why that informant, let alone the one who did not carry the label, should have been considered reliable in this instance. At most the affidavit asserts both informants demonstrated familiarity with (in the eyes of Arakawa, an experienced officer) firearms and drug sales and loosely corroborate each other's hearsay allegations against Meredith. The affidavit fails to establish either informant's personal knowledge supporting the accusation

14

Meredith was engaged in supplying street level drug dealers with methamphetamine and had been concealing the drugs in the bed of his pickup truck. (See *People v. Terrones* (1989) 212 Cal.App.3d 139, 148-149 [although informants had no track record of reliability, "the fact that the basis of their knowledge was personal observation, 'may compensate for a less than conclusive demonstration of [their] credibility'"]; *People v. French* (2011) 201 Cal.App.4th 1307, 1317 ["the affidavit does not specify any basis for CRI-1's assertion that defendant . . . [was] involved in narcotics sales and does not state that any of the information is based on the informant's personal observations"].) We acknowledge, of course, there is no "rigid formula" to be applied by a court in weighing whether to credit information provided by an informant, but the affidavit must demonstrate a balance between the informant's reliability and the basis of his or her basis of knowledge. (*French,* at p. 1316, discussing *Illinois v. Gates, supra,* 462 U.S. at p. 233.)[8] The conclusory assertions contained in Arakawa's affidavit, like those in *French*, are less than adequate.

Moreover, both the facts gleaned from the informants and Detective Arakawa's observations during the surveillance apart from the events he purportedly viewed through binoculars from 150 feet away lack sufficient detail and character to distinguish them from mere "pedestrian facts" found inadequate by other courts. (See *People v. Gotfried* (2003) 107 Cal.App.4th 254, 263-264 ["[c]ourts take a dim view of the significance of 'pedestrian facts' such as a suspect's physical description, his residence and vehicles"];

_____

[8] "'If for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip. [Citation.] Likewise, if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary. [Citation.] Conversely, even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.'" (*People v. French*, *supra,* 201 Cal.App.4th at p. 1316, quoting *Illinois v. Gates, supra,* 462 U.S. at pp. 233-234.)

15

accord, *French, supra,* 201 Cal.App.4th at pp. 1319-1320.) Although information from sources with no record of reliability may elevate seemingly innocent behavior to a suspicious level (see *Gotfried*, at p. 264), Arakawa's observations of Meredith—reaching into the front part of his pants (that is, his pockets), placing items in the bed of his pickup truck and retrieving them later, visiting a storage unit with his brother and meeting his mother at a shopping mall—hardly rise to the level of probable cause in the absence of the crucial observation of Meredith handling a bag of apparent methamphetamine in his motor home.

Courts agree "[i]t is not easy for a defendant to make the required preliminary showing under *Franks*." (*McMurtrey, supra,* 704 F.3d at p. 511; accord, *People v. Estrada, supra,* 105 Cal.App.4th at p. 791.) "The defendant must include with his allegations of material and intentional or reckless falsehoods or omissions 'an offer of proof.' [Citations.] It is well established that conclusory allegations are not enough . . . [citations], but it is equally true that the defendant need not come forward with conclusive proof of deliberate or reckless falsity. Otherwise, there would be no need for a *Franks* hearing." (*McMurtrey,* at p. 511.) In short, Meredith met his burden of establishing a right under *Franks* to an evidentiary hearing to dispute Detective Arakawa's statements in the affidavit.

c. *The transcript of the in camera hearing must be disclosed and the defense allowed to cross-examine the officers at the renewed* <u>Franks</u> *hearing*

Meredith contends the transcript of the in camera hearing, at which Detective Arakawa and Lieutenant Tatreau defended the affidavit's showing of probable cause, must be disclosed. With the exception of the portion of the hearing addressing the identity of one of the informants, we agree.

Although it appears the court failed to swear the witnesses, the statements made at this hearing are relevant to the trial court's renewed consideration on remand of the veracity of Detective Arakawa's sworn affidavit. In his affidavit Arakawa asserted the facts he set forth were based on his own personal knowledge. At the hearing, however, Arakawa admitted substantial portions of the affidavit, including the information received

16

from the confidential informants and the surveillance of Meredith's trips to the storage facility and the shopping mall, were in fact based on information he was told by Lieutenant Tatreau. While it has long been accepted for law enforcement officers to rely on information they receive from other sources (see *United States v. Davis* (9th Cir. 1983) 714 F.2d 896, 899; *United States v. Ventresca* (1965) 380 U.S. 102, 110-111 [85 S.Ct. 741, 13 L.Ed.2d 684]), it is not acceptable for officers to swear they have personal knowledge of facts when their knowledge is second-hand. As the Ninth Circuit pointedly noted in *Davis*, "This entire problem could have been avoided if [the affiant officer] had simply rewritten the affidavit to indicate that he was relying on his officers who had personally interviewed the informants." (*Davis*, at p. 899.)

In addition, although Lieutenant Tatreau was present during the in camera hearing and responded to questions posed by the court about one of the confidential informants described in Detective Arakawa's affidavit,[9] Tatreau did not respond to the court's questions about the surveillance of the motor home. Arakawa told the court he had personally observed Meredith from a distance of 150 feet handling what appeared to be a controlled substance while inside the motor home and denied the existence of any blinders or screens on the front window. Tatreau said nothing on this point, even to support Arakawa's account. Nonetheless, Tatreau later testified at trial he had observed the same incident with binoculars at a distance of only 50 feet. He also testified he was in contact with Arakawa during the surveillance by radio but Arakawa had not been present. The prosecution did not call Arakawa to clarify this point, but, called as a hostile witness by the defense, Arakawa stated he had indeed been in a location 150 from the motor home and had observed the incident through binoculars.

---

[9]     Lieutenant Tatreau's responses to the court's questioning on this point are confusing. With respect to the single informant identified by Tatreau, he first acknowledged to the court the informant, a felon, had no previous record of reliability. Tatreau then seemed to contradict himself and assure the court he had in fact had experience with the informant prior to receiving the information about Meredith.

While we hesitate to infer intentional misrepresentations by either of these officers and these statements are not directly relevant to the issue of probable cause for the warrant, it is also impossible to ignore this testimony. On remand, the court should allow the defense the opportunity to impeach the officers with their prior inconsistent statements to the extent their testimony at the *Franks* hearing merits such impeachment.

After completion of the evidentiary hearing, the court should independently determine, with any false material set aside, whether the affidavit's remaining content is sufficient to establish probable cause. (See *Franks, supra,* 438 U.S. at p. 156; *People v. Luttenberger, supra,* 50 Cal.3d at p. 10.) To the extent any of Detective Arakawa's misstatements are determined to have been intentional or made with reckless disregard for the truth and the remaining portions of the affidavit are insufficient, the court should not invoke the good faith exception to the exclusionary rule described in *United States v. Leon* (1984) 468 U.S. 897 [104 S.Ct. 3405, 82 L.Ed.2d 677] and *People v. French, supra,* 201 Cal.App.4th at pages 1323 to 1325. (See *Leon,* at p. 914, fn. 12 ["'it would be an unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment,'" quoting *Franks*, at p. 165].)

2. *The Trial Court Should Have Instructed the Jury on the Lesser Included Offense of Possession*

A trial court in a criminal case has a duty to instruct on general principles of law applicable to the case (*People v. Blair* (2005) 36 Cal.4th 686, 745), that is, "'"'those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.'"'" (*People v. Valdez* (2004) 32 Cal.4th 73, 115.) This obligation includes the duty to instruct on a lesser included offense if the evidence raises a question whether the elements of the lesser included offense, but not the greater offense, are present. (*Ibid*.; *People v. Breverman* (1998) 19 Cal.4th 142, 154.) The existence of "'*any* evidence, no matter how weak'" will not justify instructions on a lesser included offense. There must be "'evidence that a reasonable jury could find persuasive.'" (*Breverman,* at p. 162.) In addition, the failure

18

to instruct on a lesser included offense in noncapital cases is "at most, an error of California law alone" requiring reversal only when "an examination of the entire record establishes a reasonable probability that error affected the outcome." (*Id.* at p. 165.)

Simple possession of a controlled substance is a lesser included offense of possession for sale of the same controlled substance. (*People v. Oldham* (2000) 81 Cal.App.4th 1, 16; *People v. Saldana* (1984) 157 Cal.App.3d 443, 454-455.) In *Saldana*, relied on by Meredith here, an officer testified the defendant had been found lying on a bed and reached into a headboard where 18 balloons of heroin were found. (*Saldana,* at p. 450.) It was later determined the defendant shared the room with his mother and the headboard where the heroin was found belonged to her. (*Ibid.*) The defendant's brother, a known user and seller of heroin, was found in the basement of the same home and was determined to have 135 puncture wounds on his arms and to be under the influence of heroin. (*Id.* at p. 451.) As here, the People's evidence was purely circumstantial on the issue of the defendant's intent to sell, consisting of an expert's opinion based on various factors. (*Saldana,* at p. 457.) Posing the question whether there was evidence from which a jury composed of reasonable persons could have concluded the defendant possessed the heroin but did not have the intent to sell it (*ibid.*), the court concluded the defendant was entitled to the lesser included instruction because there was direct evidence to prove constructive possession (since the defendant exercised joint dominion and control over the bedroom in which the heroin was found) but only conflicting circumstantial evidence of possession for sale. (*Id.* at pp. 455, 457.)

The facts before us are similar. There was no evidence Meredith ever attempted to sell methamphetamine to anyone or possessed any of the drug in a form packaged for sale. His brother and a friend testified Meredith was a user and had spent time in a rehabilitation program. The discovery during the search of a scrap of tin foil covered in residue proved someone (possibly Meredith) in the house had used the drug in the recent past. When he was arrested the week after the house search, he had in his possession only a small amount of methamphetamine (.87 grams) and a pipe for smoking the drug. Further, although a cumulative amount of nine grams was found in various locations

19

through the house, motor home and storage unit—capable of approximately 400 doses of .02 grams each with a street value of $360—Sergeant Manumaleuna acknowledged nine grams would last a heavy user no more than a week.

We recognize, of course, Sergeant Manumaleuna also testified 80 to 90 percent of methamphetamine sellers use the drug. In testifying to his opinion the methamphetamine had been possessed for sale, Manumaleuna relied on the amount of methamphetamine, the "pay-owe" sheet found in the motor home, the rifle and ammunition, the plastic bags found in different locations, the cash and the two digital scales with methamphetamine residue on them. But, as Meredith points out, the factual assumptions made by Manumaleuna were controverted. For instance, Lieutenant Tatreau admitted Meredith's pay-owe sheet looked unlike any he'd ever seen before and speculated it had been written in code; Meredith's brother testified he was keeping the rifle for a friend and it did not belong to Meredith; Meredith's mother testified others in the house, including her granddaughter, had used methamphetamine; the granddaughter testified methamphetamine users routinely employ scales to weigh their purchases to make sure they were not being cheated; and two of the boxes of plastic bags relied on by Manumaleuna contained the foldover, sandwich-type bags, which no one testified are used for drug sales.

On this record, therefore, a reasonable jury could have concluded the methamphetamine found in the search was for the personal consumption of Meredith and his family or friends, and it is reasonably probable the omission of the instruction on the lesser included offense of possession of methamphetamine  base affected the outcome of the trial. (See *People v. Breverman, supra,* 19 Cal.4th at p. 178; *People v. Blair, supra,* 36 Cal.4th at p. 745.) Meredith was entitled to have the jury decide the issue. (See *People v. Burns* (2009) 172 Cal.App.4th 1251, 1258.)

3. *The Court May Have Erred in Failing To Give a Unanimity Instruction; On Remand, the Instruction Should Be Given As Requested*

A defendant is entitled to a verdict in which all 12 jurors concur beyond a reasonable doubt as to each count charged. (*People v. Russo* (2001) 25 Cal.4th 1124,

1132.)  "When an accusatory pleading charges the defendant with a single criminal act, and the evidence presented at trial tends to show more than one such unlawful act, either the prosecution must elect the specific act relied upon to prove the charge to the jury, or the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act."[10]  (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534; accord, *People v. Maury* (2003) 30 Cal.4th 342, 422 ["[a] requirement of jury unanimity typically applies to acts that could have been charged as separate offenses"]; *People v. Mota* (1981) 115 Cal.App.3d 227, 231 [""""where there are multiple acts placed before a jury, each being a separate chargeable offense in itself, the prosecution must elect the act on which the charge will stand," or otherwise "the jurors [might] range over the evidence at will and pick out any one of the offenses upon which to found its verdict""""].)  In cases involving alleged possession of controlled substances for sale, a unanimity instruction is required when:  (1) "actual or constructive possession is based upon two or more individual units of contraband reasonably distinguishable by a separation in time and/or space"; (2) "there is evidence as to each unit from which a reasonable jury could find that it was solely possessed by a person or persons other than the defendant"; and (3) the People have not elected to rely on only one of the individual units.  (*People v. King* (1991) 231 Cal.App.3d 493, 501-502 (*King*); see also *People v. Castaneda* (1997) 55 Cal.App.4th 1067, 1070-1071 (*Castaneda*) [factors to be considered in determining when unanimity instruction is necessary are whether defendant raised separate defenses to separate contraband items and whether there is conflicting evidence over ownership of such items].)  If a case requires use of the unanimity instruction, the court must give it sua sponte.  (See *People v. Hefner* (1981) 127 Cal.App.3d 88, 97.)

---

[10]      CALCRIM No. 3500 provides:  "The defendant is charged with < *insert description of alleged offense* > [in Count ---] [sometime during the period of---- to ----]. [¶]  The People have presented evidence of more than one act to prove that the defendant committed this offense.  You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

The defendant in *King* was convicted of possession for sale after methamphetamine was found at two different locations in her home—a purse found in the living room and inside a decorative statue in the kitchen. (*King, supra*, 231 Cal.App.3d at pp. 497-498.) The evidence showed that the purse belonged to someone else; the home had multiple occupants; and the defendant's boyfriend testified the drugs found in the statue belonged to him. (*Id.* at pp. 497-500.) The court of appeal held the unanimity instruction was required because the two units of methamphetamine had been found in separate parts of the house and there was evidence sufficient to lead a reasonable jury to believe it had belonged to another person. (*Id.* at pp. 501-502.)

Similarly, in *Castaneda,* the court concluded a unanimity instruction was required because the defendant's conviction for possession of heroin could have been based upon either constructive possession of heroin found on his television set or actual possession of heroin found in his pocket at the sheriff's station. (*Castaneda, supra,* 55 Cal.App.4th at pp. 1070-1071.) The court found the acts of possession were distinct, and the defendant had provided separate defenses to each act: The defendant's son testified the heroin found on the television belonged to him; and defense counsel argued the heroin found in the defendant's pocket was planted or otherwise fabricated. (*Id.* at p. 1071.) *Castaneda* concluded the trial court had a sua sponte duty to give the jury a unanimity instruction on which act or acts constituted the offense of possession. (*Ibid.*)

The facts in this case fall short of the facts in *King* and *Castaneda.* Certainly, there was evidence of possible access by other people (including at least one other methamphetamine user) to the five locations in which the methamphetamine was found. No one who testified, however, claimed to own any portion of the drug. The People argued the jury could base its verdict on count 4 on the cumulative amount of drugs found and the drug sale paraphernalia also found in multiple locations. In his defense Meredith claimed the methamphetamine did not belong to him and had been found in quantities and under circumstances consistent with use, not sales. We see no reason to thread the needle on these arguments in light of our conclusion the count must be retried with an instruction to the jury on the lesser included offense of simple possession. At the

22

same time, the court may instruct the jury with CALCRIM No. 3500 to avoid any possible jury confusion.

## DISPOSITION

With the exception of Meredith's conviction for possession of methamphetamine (count 6), the judgment is reversed. The matter is remanded to the trial court with directions to set aside its December 7, 2010 order denying Meredith's motion to traverse the warrant and to conduct an evidentiary hearing consistent with this opinion and the requirements set forth in *Franks*. If, after the hearing, the court denies the motion and the People elect to retry Meredith on the possession for sale count, at the retrial an instruction for the lesser included offense of simple possession and a unanimity instruction should be given. If the court finds the affidavit lacking in probable cause and invalidates the warrant, Meredith is entitled to a new trial on count 2, as well as count 4.

PERLUSS, P. J.

We concur:

WOODS, J.

ZELON, J.

23