[No. F013396. Fifth Dist. June 20, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
LINDA LAYNE KING, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

494

**COUNSEL**

Donald S. Altschul, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Michael J. Weinberger and Roger E. Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HARRIS, J.—**

### INTRODUCTION

At the conclusion of a jury trial on December 15, 1989, Linda Layne King was found guilty of being in possession of methamphetamine for purpose of sale in violation of Health and Safety Code section 11378. The jury found true an enhancement that Linda King was personally armed with a firearm in violation of Penal Code section 12022, subdivision (b). King also was found guilty of unlawfully possessing drug paraphernalia in violation of Health and Safety Code section 11364. Additionally, she was found guilty of being unlawfully in possession of less than 28.5 grams of marijuana in violation of Health and Safety Code section 11357, subdivision (b).

Sentencing was conducted on January 22, 1990. Without stating any reasons, the trial court summarily denied appellant probation. As to count I, it imposed the midterm of two years with a four-year enhancement for using a firearm. The trial court imposed a concurrent term of six months in the county jail for possessing drug paraphernalia, and a term of four days in the county jail for marijuana possession. The latter two terms were to be served concurrently. A restitution fine of $100 was imposed and credits were awarded for time already served. Appellant filed a timely notice of appeal on January 24, 1990.

### FACTS

Edward Keener owns a rental property at 312 Water Street in Bakersfield. On September 5, 1989, he rented the property to Linda King. She was to move in September 12, 1989. She paid $1,200 in cash for the first and last month's rent and for the cleaning deposit.

Barbara Morland works for Ability Answering Service as a supervisor. On September 6, 1989, she sold a pager to a male. The male used the name Rick Moore. He purchased the telephone pager unit and one year of air time. The pager had a cap code as well as its own phone number. Rick Moore showed

no identification when he made the purchase. At trial Ms. Morland did not recognize appellant.

Moore completed a standard service agreement. Moore wrote a personal phone number of 833-0635 on the form. When witness Morland was asked about the contents of the form, defense counsel lodged an objection based on hearsay to the contents of the form. Counsel made his objection a continuing one to the entire line of questioning concerning the contents of the service agreement.

Kevin Clerico is a criminal investigator for the Kern County District Attorney's office. He testified that the name on the service application was Breeland Backhoe. The address listed on the application for the pager was 197 East Pacheco Street. Clerico went to that address and found no Breeland Backhoe. He also failed to find that name in the phone book. Another address listed on the document, 1901 California Street, did not exist. The phone number on the document, 833-0635, was not in service.

Steven Green is the branch manager for Metromedia Paging Services. Metromedia sells its pager frequency number in Bakersfield to Chaffee Enterprises which owns Ability Answering Service. According to Green, each pager has its own unique cap code and serial number. Metromedia is in charge of keeping track of all pagings that go to a particular pager.

Pager companies can keep track of the phone calls that are made to the pager. A printout is run each month for any pager number that receives more than 200 calls.

Green was the custodian of records for the pager company. He explained that his pager company tracks only the number of calls that are sent to the pager phone number. His company cannot track location of the calls. Green's printout, which is kept in the ordinary course of business, revealed that through September 23, 1989, the pager purchased by Rick Moore and which was subsequently found in appellant's possession at the time of her arrest had received 523 phone calls. According to Green, less than 3 percent of the pagers on their system receive more than 200 calls in 1 month.

Mort Frey is a detective for the City of Bakersfield Police Department vice division. Along with Detective Jeff Sivesind, he executed a search warrant at 312 Water Street on September 20, 1989. Before executing the warrant, he spent two hours surveilling the home.

Frey saw two females in the yard. During his surveillance, a light blue Chevrolet with two males arrived at the residence and stayed for ten minutes.

Jeff Sivesind is also a detective with the City of Bakersfield Police Department. He works in the narcotics unit. Prior to September 20, 1989, Sivesind had conducted a surveillance of the residence on three or four separate occasions for forty-five minutes to one hour. Both appellant and Ms. Peebles were seen on the premises. Each time, Sivesind observed a pattern of three or four cars driving up to the residence and staying from three to five minutes before driving away.

The officers serving the warrant drove up in unmarked police cars. Appellant was opening her front gate at the time. When she saw the officers drive up, she started screaming "police." Ms. Peebles was observed running out the back door into the backyard area. Ms. Peebles was not carrying anything at the time she fled the house. She was apprehended in the backyard. No one else was found inside the house.

As the warrant was being executed, a Detective Bennett stopped and detained appellant. She was carrying her purse at the time. Inside her purse was a loaded .44-caliber revolver. Sivesind ran past her to secure the premises. Officers then commenced their search of the residence.

Officers found a blue-and-red-colored gym bag and clothing in the rear yard adjacent to the back door. These items were consistent with the types of things the women had been unloading from their cars. In the gym bag officers located a triple-beam scale and a bottle containing 100 percent niacinamide, both commonly used in cutting drugs, a marijuana pipe, various sized plastic baggies and a purple purse containing a spoon and two syringes.

A Ziploc baggie containing methamphetamine and a syringe loaded with methamphetamine were found in a purse which previously had been used by Ms. Peebles. The purse was found in the living room area of the residence. Two syringes were also found in the car used by appellant.

A smaller Ziploc baggie containing methamphetamine was found concealed inside a decorative ceramic statue that was on top of a shelf above the kitchen sink. A marijuana cigarette and some marijuana seeds were found on a yellow metal plate which was on a television stand in the living room area. A police scanner was found on a dresser in the only bedroom. A listing was also found next to the scanner of 10 radio dispatch codes used by law enforcement, police radio terminology, police abbreviations, and references to the Penal and Vehicle Codes. Detective Sivesind testified that drug dealers often used police scanners as warning devices.

Papers were found in the residence listing the names and telephone numbers of several individuals, including numbers for motels. Another paper listed various initials with amounts set forth next to the initials.

A business card and several notebooks that were discovered on the premises also had similar notations. These entries were described by Detective Sivesind as indicative of pay-and-owe documents used by drug dealers as a kind of ledger sheet. Several of these pay-and-owe documents were discovered in appellant's purse. Another was found in her pocket along with $1,394 in currency. More pay-and-owe sheets were found in appellant's bedroom and in the living room. Her name and other personal information were entered in one of the notebooks described as a pay-and-owe sheet.

The pager was found in Linda King's pocket. Methamphetamine was found in three different locations. Methamphetamine in the amount of 2.5 grams was located in the purse in the living room. There was also a syringe in that purse containing liquid methamphetamine in the amount of .33 grams. A small Ziploc baggie containing .76 grams of methamphetamine was found stuffed into the ceramic statue.

Detective Sivesind admitted no drugs were found on appellant's person. Detective Sivesind, however, was asked to discount the existence of the 2.5 grams of methamphetamine that had been found in Ms. Peebles's purse. When asked to assume that officers had not found the 2.5 grams of methamphetamine, and assuming that all that was found was the .76 grams of methamphetamine together with pay-and-owe sheets, the cutting agent, the scales, and the other items found on the premises, Detective Sivesind stated that in his opinion the .76 grams of methamphetamine found was enough to justify the charge of possession with intent to sell. In light of all the items found, Detective Sivesind's opinion was that the drugs were possessed for purposes of sale. At the time of her arrest, appellant did not appear to be under the influence of any drug.

Appellant's defense came through the testimony of her boyfriend, Keith Oxford. Oxford claimed he had given appellant $1,000 to rent the premises and lived there with her. Oxford testified that he also gave appellant approximately $1,500 to buy a car. Oxford also testified that the methamphetamine found in the statue in the kitchen belonged to him and that he kept some marijuana in the living room and a syringe in appellant's automobile. Oxford denied owning any scales, cutting agent, pay-and-owe sheets or syringes found in the house. Bills in Oxford's name for 312 Water Street were submitted from a cable company, the gas company, and the telephone company.

In rebuttal, officers testified they did not find any documents addressed to Keith Oxford on the premises. They also failed to find any male clothing in their search of 312 Water Street. Officers never observed Keith Oxford at the

residence during their surveillances and never observed him driving appellant's Trans Am automobile.

In closing arguments counsel's comments pertaining to possession of methamphetamine located in the living room were as follows: "[Defense counsel] . . . [T]here is no connection shown between [Mrs. King] and the items that are contained in the other woman's purse. . . . [¶] And we've all been discussing this one item because you can't reasonably say that Mrs. King had possession of the property that was in the other woman's purse. If there is anything that we're really arguing over it's the stuff that was in this little container." To this the district attorney responded: "Now, [defense counsel] has indicated that Miss Peebles had the larger amount of dope in her purse. She did. However the Judge will tell you that more than one person can possess an item."

DISCUSSION

I.

UNANIMITY INSTRUCTION

■   Appellant contends that her conviction pursuant to count I for possession of methamphetamine for purpose of sale must be reversed because the trial court failed to give CALJIC No. 17.01, the unanimity instruction. CALJIC No. 17.01 instructs a jury that a defendant can be found guilty only if there is proof beyond a reasonable doubt that the defendant committed any one or more criminal acts or omissions. The jury is instructed that before it can return a guilty verdict, all jurors must unanimously agree that the defendant committed the same criminal act or omission.

Appellant's theory is that methamphetamine was found in small quantities at three different locations. The amount of .76 grams was found in a statue. Mr. Oxford testified the statue and its contents of methamphetamine belonged to him. The amount of .33 grams of liquid methamphetamine was found in Ms. Peebles's purse. The amount of 2.5 grams of methamphetamine was also found in Ms. Peebles's purse. Appellant believes that if some of the jury agreed beyond a reasonable doubt that the .33 grams belonged to appellant, or that the .76 grams belonged to appellant, or that the 2.5 grams belonged to appellant, the jury arguably could have created a patchwork verdict whereby different jurors believed that the different stashes of methamphetamine belonged to appellant. If this is true, then the jury was not unanimous in its determination that a particular quantity of methamphetamine was in appellant's possession for the purpose of sale.

The most thorough and recent examination of the unanimity instruction can be found in this court's decision in *People* v. *Melendez* (1990) 224 Cal.App.3d 1420 [274 Cal.Rptr. 599]. *Melendez* traces the history of the unanimity instruction, examining it from its constitutional underpinnings through all of its applicable exceptions. (224 Cal.App.3d at pp. 1426-1433.) The facts in *Melendez* were particularly convoluted. The defendant in *Melendez* was found guilty of robbery. His criminal act was equally consistent with theft or burglary.

There was inconsistent testimony by several different witnesses in *Melendez*. Based on this inconsistent evidence, different jurors or groups of jurors could conceivably have found the defendant there guilty of different criminal acts. (224 Cal.App.3d at p. 1433.) We found in *Melendez* that though there was an exception to the unanimity instruction where the jury could find a defendant guilty of a particular criminal act based on a different legal theory, there was too great a probability in *Melendez* that the jury found the defendant guilty using a patchwork verdict that could have been based not only on different legal theories but on different criminal acts as well. Under the circumstances present in *Melendez*, the unanimity instruction should have been given, and the case was reversed. (224 Cal.App.3d at pp. 1433-1434.) The jury instruction was not requested by either counsel creating a sua sponte duty for the trial court to give the instruction. (224 Cal.App.3d at pp. 1426-1427.)

Here there was conflicting evidence concerning ownership of the statue and its contents and reasonable inferences could be drawn that appellant did not have knowledge of or possession and control over the purse. If it is possible that a portion of the jury believed that appellant possessed only the statue and its contents and the balance of the jury believed that appellant only possessed the purse and its contents, then without the unanimity instruction there is no way to be positive that the verdict was unanimous as to a particular criminal act, and it is possible appellant was found guilty based on a combination of different criminal acts determined in each case by less than all 12 jurors.

In our review, we have found two authorities that are closely analogous to the instant case. The first case is *People* v. *Wright* (1968) 268 Cal.App.2d 196 [73 Cal.Rptr. 692]. There, officers stopped youths who all appeared to be nonalcoholically intoxicated. One of the youths jumped out of the car, ran toward the edge of a cliff near Dana Point and threw a package off the cliff. The package dispersed what looked to be 10 to 15 fat, blunt and yellow handrolled cigarettes. Three marijuana cigarettes were found in the car. The following day officers found two marijuana cigarettes on the cliff. (268 Cal.App.2d at p. 197.)

*Wright* held that the unanimity instruction did not have to be given because the issue presented was not whether Wright possessed each narcotic item in the area but whether he possessed a usable amount at the time and place charged in the information. *Wright* noted that the evidence showed that all the marijuana came from the same car, the same location, and that the act of possession was not fragmented by time or space.

The second authority closely analogous to our case is *People v. Crawford* (1982) 131 Cal.App.3d 591 [182 Cal.Rptr. 536]. *Crawford* involved possession of a firearm by an ex-felon. (*Id.* at p. 593.) The defendant there allegedly had a handgun holstered at the foot of his bed and another firearm in his closet. Two other guns found in a housemate's bedroom were introduced into evidence. The defendant denied ownership of the housemate's guns and of the gun in his closet. He testified that he had never seen the holstered gun found at the foot of his bed. The defendant's girlfriend claimed ownership of the gun found in the defendant's closet and testified that she had never seen the defendant in possession of the gun. (131 Cal.App.3d at pp. 594-595.)

*Crawford* noted that the acts of constructive possession involving the four guns were different. Harmonizing *Wright,* the *Crawford* court found that the act of possession in *Wright* was not fragmented as to time or space. The *Crawford* court found that possession there was not fragmented as to time but that it was fragmented as to space because guns were found in different parts of the house. There were also unique facts involving the possessory aspect of each weapon. *Crawford* concluded that CALJIC No. 17.01 should be given where the acts of possession are not factually identical. (131 Cal.App.3d at p. 599)

*Crawford* pointed out that conversely, where criminal acts are substantially identical in nature so that a juror who believed one act took place "would inexorably believe all acts took place," the unanimity instruction is not necessary for the jury's resolution of the case. (131 Cal.App.3d at p. 599.) We agree with the *Crawford* court's analysis. In the instant case, like *Crawford,* there was a separation of the contraband by space and there was conflicting evidence as to the ownership of the narcotics themselves.

■ We hold that in a prosecution for possession of narcotics for sale, where actual or constructive possession is based upon two or more individual units of contraband reasonably distinguishable by a separation in time and/or space and there is evidence as to each unit from which a reasonable jury could find that it was solely possessed by a person or persons other than the defendant, absent an election by the People CALJIC No. 17.01 must be

given to assure jury unanimity.[1] We find that it was error for the trial court not to give the unanimity instruction in this case and reverse.

## II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed.

Martin, Acting P. J., and Ardaiz, J., concurred.

---

[1]In this case the jury was instructed on the lesser included offense of illegal possession of a controlled substance, a violation of section 11377, subdivision (a) of the Health and Safety Code. Our holding would be equally applicable had appellant's conviction been of that offense.

*See footnote, *ante*, 493.