Filed 2/7/24  P. v. Ruiz CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>           v.<br><br>MICHAEL ANTHONY RUIZ,<br><br>      Defendant and Appellant. | F085818<br><br>(Super. Ct. No. VCF426969)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted defendant Michael Anthony Ruiz of assault with a firearm (Pen. Code, § 245, subd. (a)(2); count 1), two counts of exhibiting a firearm (§ 417, subd. (a)(2)(B); counts 2 & 3), a misdemeanor; and vandalism under $400 in damage (§ 594, subd. (a); count 4), a misdemeanor.

On appeal, defendant argues the court erred in failing to instruct the jury sua sponte on unanimity because the jury could have relied upon two different acts in convicting him of assault with a firearm (count 1): the hitting of the named victim with a firearm in the head or the pointing of the firearm at the victim. Relatedly, defendant asserts his counsel provided ineffective assistance by failing to object to portions of the prosecutor's closing argument that defendant asserts suggested a conviction could be based upon either theory. Finally, he alleges the cumulative effect of these errors prejudiced him.

We reject all of defendant's contentions and affirm the judgment.

## FACTUAL BACKGROUND

B.W. lived in an apartment in Visalia on February 11, 2022. J.F. lived with B.W. for two weeks in February 2022; J.F. would sleep on the couch. They knew each other from Alcoholics Anonymous meetings. Defendant lived in the same apartment complex. He and B.W. drank beer together sometimes. Before February 11, 2022, B.W. and defendant never had any issues or arguments.

On February 11, 2022, B.W. and J.F. were at B.W.'s apartment along with R.I. According to B.W., he had drank two cans of beer by around 1:30 to 2:00 p.m. that afternoon when defendant came by. B.W. denied his judgment was clouded at the time.

B.W. testified the door to his apartment was open and he saw defendant come up the stairs. Defendant entered B.W.'s apartment and B.W. said, "Hi"; he was standing facing defendant. Defendant said, "'What's up,'" and then hit B.W. over the head with a gun. B.W. testified defendant hit him with enough force to stun him but not enough to

2.

make him bleed or fall. He testified it felt like the gun was heavy and loaded when it hit the top of his head. B.W. stated he had a bump on his head afterwards and felt pain for 15 to 20 minutes. B.W. described the gun as a silver or gray semiautomatic pistol. J.F. was sitting in a chair less than a foot away from B.W.; R.I. was in the bathroom. B.W. testified, after defendant hit him, defendant pointed the gun at his face. Defendant was yelling "something like, 'What's up? What's up?'" Then, defendant pointed the gun at J.F.'s face while J.F. was sitting in the chair. J.F. did not say anything.

At trial, J.F. identified defendant as the person who pointed a gun at his face. J.F. had met defendant a few times before the charged incident; they had no issues before that day. J.F. also testified the door to B.W.'s apartment was open and defendant walked in with a chrome gun in his hand. J.F. first saw the gun when defendant hit B.W. over the head with the butt of the gun. J.F. stated B.W. had his back turned when defendant came in "and clobber[ed] him over the head with a gun." J.F. testified defendant hit B.W. hard enough that B.W. "hit the ground." He described it as a "haymaker throw," meaning defendant threw his "whole arm into it." According to J.F., defendant also walked over to J.F., kneeled in front of him, and stuck the gun in his face between his eyes. Defendant did not say a word. J.F. "started talking logic" to defendant. He told defendant to think about what he was doing, and defendant lowered the gun.

B.W. testified he felt like their lives were in danger. He asked defendant, "What are you doing? Why do you have a gun? What's wrong?" B.W. then ran into the bedroom to try to distract defendant; he shut and locked the bedroom door. B.W. was yelling at defendant loudly to try to alert R.I. something was going on so she would not come out of the bathroom. Defendant was kicking the bedroom door for approximately a minute and a half and saying in a hostile tone, "'Let me get at you real quick.'" The prosecution introduced pictures of B.W.'s bedroom door after the incident; there appeared to be a hole in the door and wall.

3.

R.I. testified she was in the bathroom when she heard loud slamming and B.W. yelling, "Stop!" The noise lasted approximately 20 to 30 seconds. At some point, R.I. cracked open the bathroom door and peeked out. She saw a man with a gun turn toward her; he pointed the gun at her head. At trial, R.I. identified defendant as the man with the gun. R.I. testified she felt scared and threatened and the gun looked real. Defendant told her not to come out. R.I. backed up against the wall of the bathroom. She waited about a minute until it was silent and then she stepped out of the bathroom to see what was going on. She saw J.F. shaking and crying in the living room.

B.W. opened the bedroom door after a minute and a half because he was concerned about R.I. and J.F. He saw R.I., who appeared to be scared and in shock. R.I. testified B.W. told her "that guy" had hit him over the head with something and was trying to fight him. R.I. saw redness on B.W.'s head, but he was not bleeding or cut. When R.I. told B.W. defendant had pointed a gun at her, B.W. "acted surprised." R.I. was not sure if B.W. was surprised defendant had a gun or that he had pointed it at her.

B.W. testified he ran out to the balcony to see if he could find defendant. He wanted to make sure defendant was not still a threat. He saw defendant downstairs; defendant did not have anything in his hands. Defendant said, "'Come down here, let me get at you. I don't have no gun.'" B.W. testified he told defendant "if he ever came in [his] apartment again and threatened [his] family that [he] would kill him." Defendant eventually walked away towards his own apartment. J.F. left immediately after the incident. At trial, J.F. testified he did not want to talk to the police. He stated he looked at B.W.'s head after the incident and it looked like it was bleeding and there was a lump.

Lorenzo M. lived in the same apartment complex on February 11, 2022. He lived next door to B.W. Lorenzo M. knew defendant as B.W.'s friend; defendant and B.W. would hang out "all the time" at B.W.'s apartment and drink beer. Lorenzo M. was at B.W.'s apartment on February 11, 2022, and went home around 1:00 p.m. He saw B.W. again around 2:00 p.m. and B.W. was complaining about being injured and had red marks

on his forehead. B.W. said he had been pistol-whipped with a gun; he "looked like he was gonna cry." Lorenzo M. did not notice any injuries on B.W., but he saw a red mark on his forehead. Lorenzo M. saw J.F. in B.W.'s apartment; R.I. was also there. J.F. was "hysterical" and also looked like he wanted to cry; "[t]hey were scared." Lorenzo M. called 911 and J.F. left the apartment. The police arrived a couple of minutes later.

Mary G., another neighbor in the apartment complex, recalled hearing a commotion in the courtyard. She saw J.F. in his wheelchair and she asked if he was okay. J.F. looked "very startled, very pale." He told Mary G. defendant had pointed a gun at him and also aimed it at B.W. and R.I. Mary G. recalled that B.W. was yelling at the rail of the balcony; he was holding a beer. Mary G. testified B.W. gets really loud, verbal, and can get physical when he is drunk.

Detective Kyle Kalender spoke with B.W. after the incident. B.W. was hysterical at times and seemed angry or frustrated; he did not appear intoxicated to Kalender. Kalender did not notice any injuries on B.W. though he did not touch the top of B.W.'s head. There was a hat in B.W.'s apartment after the incident that B.W. believed to belong to defendant. It was a black Raiders hat. The police took the hat to the apartment they believed belonged to defendant's mother and left it with her. She denied it was defendant's hat.

B.W. saw defendant walking his dog "off and on" between that day and the beginning of April; defendant never came to talk to B.W. B.W. called the police more than once during that time because he "was mad about having to live there with [defendant] walking around like that." On March 15, 2022, after reviewing multiple photographs, B.W. identified a photograph of defendant as the perpetrator for the police; B.W. admitted he had been drinking the day of the identification. B.W. was angry with the police because of how long it was taking them to investigate the incident. The police told B.W. to stop calling 911.

5.

Mary Amparo Ruiz testified on behalf of the defense. She stated defendant was her boyfriend and they had been together for 17 years. However, Detective Kalender testified in rebuttal that, on the day of the incident, she told him three times that defendant was her son, not her boyfriend. She testified, on February 11, 2022, a police officer appeared at her door and asked her about a hat and whether it belonged to defendant; she denied it was his and the police left with it. Defendant was not home at the time; he had left earlier that day around 8:00 a.m. She denied ever seeing defendant with a firearm or that he stored one at her house. She also denied hearing yelling that day.

The jury convicted defendant of all the charges: assault with a firearm upon B.W. (Pen. Code, § 245, subd. (a)(2); count 1), brandishing a firearm or deadly weapon on R.I. and J.F. (§ 417, subd. (a)(2)(b); counts 2 & 3), and vandalism under $400 (§ 594, subd. (a)). It also found true an allegation defendant personally used a firearm during the commission of count 1 (§ 12022.5, subd. (a)). The jury further found true the following factors in aggravation: (1) the crime involved great violence, great bodily harm, the threat of great bodily harm or other acts disclosing a high degree of cruelty, viciousness or callousness; (2) defendant was armed with or used a weapon at the time of the commission of the crime; (3) defendant had engaged in violent conduct that indicates a serious danger to society. The court found true an allegation that defendant had suffered a prior strike conviction qualifying as a prior serious felony conviction (§ 667, subd. (a)(1)). It sentenced defendant to an aggregate term of seven years: the low term of four years on count 1 (two years doubled based on the strike prior) and the low term of three years for the section 12022.5 firearm enhancement. The court imposed "[n]o time" for counts 2 and 3.

6.

## I.    Unanimity Instruction

Defendant first argues the court prejudicially erred in failing to instruct the jury sua sponte on unanimity regarding the assault with a firearm charge.  We disagree.

### A.    Relevant Background

In opening statement, the prosecutor asserted:  "[W]e are here 'cause on February 11, 2022, the defendant … hit [B.W.] over the head with a firearm.  The defendant pointed that same firearm at two other individuals, [R.I.] and [J.F.]  He then kicked and destroyed [B.W.]'s bedroom door."  The prosecutor then detailed the evidence the jury could expect to hear and stated, "[A]t the end, you're gonna be asked three questions:  Did the defendant hit [B.W.] over the head with a firearm?"  [¶] Did the defendant point the firearm at [R.I.] and [J.F.] in a threatening manner?  [¶] And did the defendant damage [B.W.]'s bedroom door for less than $400?"  Defense counsel also asserted in her opening statement:  "[T]he evidence will show [defendant] has been accused of hitting [B.W.] over the head with a haymaker motion, like this, as it's been described and probably will be reenacted on the stand like this with a metal, loaded firearm, and you'll hear that story from [B.W.] and [J.F.]."  She stated defendant was "confident that you will find [defendant] not guilty of assault with a firearm … by smashing him in the head."

In discussing the jury instructions on assault with a deadly weapon (CALCRIM No. 875), defense counsel stated she was "a little confused about how the instruction's going to go because [B.W.] said 'he pointed a gun at me, and he hit me over the head with a gun' ….  So that's two different acts."  She expressed concern that the instructions said "there doesn't have to be an injury for an assault that they're gonna think that somehow the assault to [B.W.] by going like this, if they believe that he pointed a gun at everyone, there's no place to vindicate [B.W.] except to say assault with a deadly weapon

or assault with a gun, firearm." She attempted to clarify that B.W.'s testimony "was that [defendant] pointed a gun at him and [defendant] bashed him over the head," but defendant was only charged in count 1 with "bashing him over the head." "It's not related to him being pointed at with a gun." The court and the prosecutor agreed with defense counsel.

Defense counsel then stated she was worried the jury would "conflate the two somehow … because there's no brandishing charge for [B.W.]" But there was no assault with a firearm against B.W. in this case if the jury just believed defendant pointed the gun at B.W. "because there would have to be proof that the gun was loaded. So I don't know how to stop them—" The following exchange then took place:

"THE COURT: What's the solution. I don't expect [the prosecutor] to get up there and suggest that they can convict him based solely on pointing the gun at … [B.W.] alone.

"[DEFENSE COUNSEL]: Right, but if your argument is he pointed the gun, he hit him in the head, he's guilty, … how do you separate those?

"THE COURT: Well, there is the language to have present ability to inflict injury, the gun must be loaded and operable unless it's a club or bludgeon. [¶] There's no evidence the gun was loaded. [¶] What would you suggest the solution is?

"[DEFENSE COUNSEL]: I don't know yet. I just know there was so much focus on there doesn't have to be an injury to prove this, which is true, but—

"THE COURT: I just don't see a problem. So long as [the prosecutor] gets up there and makes it clear his theory is the 245 is based on the haymaker.

"[DEFENSE COUNSEL]: That's fine with me, too, if it's about the haymaker. I'm worried about conflating and confusing.

"[PROSECUTOR]: I think instructions are clear, and we're assuming that they can distinguish the two. [¶] I have more elements to prove for 417. You know, is it more likely that a gun exists if it's pointed at somebody? I'm allowed to make that argument that the gun exists, but I'm

not gonna conflate the two.  I mean, there's completely different elements.  I mean, I have—

"THE COURT:  So you anticipate making it clear to the jury your theory for Count 1 is the—

"[DEFENSE COUNSEL]:  Haymaker.

"[PROSECUTOR]:  Yes.

"THE COURT:  —strike to the head?

"[PROSECUTOR]:  Yes, of course—

"THE COURT:  Okay.

"[PROSECUTOR]:  —but if I say, like, there's proof that the gun existed because it was so close to [B.W.]'s face.  [¶] It's obvious that it's different, so I just—yeah.

"[DEFENSE COUNSEL]:  Where does it say on here about the that [*sic*] part?  I know we talked about it.

"THE COURT:  The very end.  It's on Page 46, Line 14 and 15—Lines 14 and 15.

"[DEFENSE COUNSEL]:  All right.  I see that now.  [¶] All right.  So your plan is to make it clear that that's your theory?

"[PROSECUTOR]:  I'm gonna argue my theory.  It's obvious—there's elements–I'm gonna talk about the elements.

"[DEFENSE COUNSEL]:  Okay.  All right."

As they continued through the jury instruction conference, the court stated it was not sure CALCRIM No. 3500 on unanimity applied because, as far as it could tell, "the theory is that the strike to the head is it.  There's not more than one act."  The prosecutor confirmed that was correct and, accordingly, the court stated CALCRIM No. 3500 was "out."

In closing argument, the prosecutor explained the elements of assault with a firearm and tied them to the bludgeoning incident.  With regard to the element that "the

9.

defendant's actions with a firearm by its nature directly and probably result in the application of force to a person," the prosecutor argued: "You hit someone over the head, by its nature, or swing a firearm, by its nature, it's gonna hurt someone over the head. It's gonna apply force. The slightest touch is enough. The defendant did this act willfully." He also argued he had to prove defendant had "the present ability to inflict injury, [the] gun must be loaded and operable unless it is used as a club or a bludgeon. That's what happened in this case; that the defendant used the gun as a club or a bludgeon. It does not have to be loaded or operable, just has to be a firearm."

The prosecutor also argued that defendant "assaulted [B.W.] with a firearm. What does our common sense and experience tell us about assaulting with a firearm? That it's traumatic. It is an incredibly dangerous act because all it takes for someone's life to be ended is a quick pull of the trigger, could be a second. So common sense tells us that the victims would be traumatized in this case. Their behavior would show by what they saw, and that's what happened." He argued that "[e]veryone was upset"; J.F. and B.W. looked like they were going to cry; J.F. was shaking and pale. "This is how much of a traumatic incident it was that they were assaulted with a firearm." He asserted B.W. consistently reported that defendant hit him over the head with a gun and defendant pointed the gun at J.F. and R.I. He argued defendant "assaulted them with a firearm."

Defense counsel argued in closing argument that the "main accusation" was that defendant "hit … [B.W.] over the head with a metal handgun. The blow is described as a haymaker punch, a punch delivered with great force. That is the main accusation here." She relied on inconsistencies between the witnesses' statements to argue the eyewitnesses were not credible. She also argued there was no evidence B.W. was injured as a result of the blow.

## B. Standard of Review and Applicable Law

In a criminal case, a jury verdict must be unanimous. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) The jury must agree unanimously the defendant is guilty of a *specific* crime. (*Id.* at p. 1132; see *People v. Covarrubias* (2016) 1 Cal.5th 838, 877–878.) "Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo*, *supra*, at p. 1132; accord, *People v. Covarrubias*, *supra*, at p. 878; *People v. Brown* (2017) 11 Cal.App.5th 332, 341.) "Yet 'where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the "theory" whereby the defendant is guilty.'" (*Covarrubias*, at p. 878; accord, *Russo*, at p. 1132.)

"This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]" (*People v. Russo*, 25 Cal.4th at p. 1132.) "But unanimity as to exactly how the crime was committed is not required." (*Id.* at p. 1135.) "Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts form the basis of a guilty verdict on one discrete criminal event.' [Citation.]" (*Ibid.*) "In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime." (*Ibid.*) "In the first situation, but not the second, it should give the unanimity instruction." (*Ibid.*)

11.

"[A] unanimity instruction is not required if 'the defendant offered the same defense to both acts constituting the charged crime, so no juror could have believed defendant committed one act but disbelieved that he committed the other, or because "there was no evidence from which the jury could have found defendant was guilty of" the crime based on one act but not the other.'" (*People v. Covarrubias*, *supra*, 1 Cal.5th at p. 879 [defense to all takings was to accuse coparticipant of testifying untruthfully so it was inconceivable a jury would believe coparticipant with regard to one taking and not the others]; accord, *People v. Jennings* (2010) 50 Cal.4th 616, 679 ["no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime"]; see *People v. Riel* (2000) 22 Cal.4th 1153, 1199, 1200 ["Even assuming that two distinct robberies occurred rather than one continuous robbery, 'there was no evidence here from which the jury could have found defendant was guilty of' the robbery in the car but not the earlier one'"]; defense was the same to both and "this *is* 'a case where the jury's verdict implies that it did not believe the only defense offered'"].)

A unanimity instruction is also *not* required when the acts alleged are so closely connected as to form part of one continuing transaction or course of conduct. (*People v. Williams* (2013) 56 Cal.4th 630, 682.) Specifically, this "continuous conduct" exception applies when (1) the defendant's acts are so closely connected in time as to form part of one transaction, or (2) when the statute the defendant is charged with violating contemplates a continuous course of conduct or a series of acts over time. (*People v. Jennings*, *supra*, 50 Cal.4th at p. 679.)

We apply a de novo standard of review when considering whether the trial court erred in not giving a unanimity instruction. (See *People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.)

## C.    Analysis

Defendant argues the court erroneously failed to sua sponte instruct the jurors on unanimity with regard to count 1. He asserts the prosecutor clearly stated during the discussion of jury instructions that he would elect the use of the gun as a bludgeon as the basis for the assault with a firearm charge. He contends, however, in closing argument, the prosecution "emphasized the possibility of the assault with a firearm being based on the gun shooting dangerous projectiles." He relies upon excerpts from the prosecutor's closing argument, including but not limited to the prosecutor's statements: "'The defendant assaulted [B.W.] with a firearm. What does our common sense and experience tell us about assaulting with a firearm? That it's traumatic. It is an incredibly dangerous act because all it takes for someone's life to be ended is a quick pull of the trigger, could be a second.… [¶] … [Y]ou heard everyone was crying. Everyone was upset.… This is how much of a traumatic incident it was that they were assaulted with a firearm.'" He also references the prosecutor's statement: "'And then when [B.W.] came out, he got pointed [at with] a gun. He got surprised. Well, he got angry, got very upset, got very upset [R.I.] got pointed at [with] a gun….'" He argues there was evidence defendant hit B.W. over the head and pointed the gun at his face; thus, a unanimity instruction was needed. Accordingly, he argues, the trial court's instructions permitted the jury to convict him of this count without agreeing on a single, specific act as the basis of his conviction.

The People respond a unanimity instruction was not required because the prosecutor communicated to the jury in both opening and closing argument that the felony assault charge was based upon defendant clubbing B.W. on top of the head with the gun; thus, he elected the theory upon which this charge was based. They assert, in closing, "[e]very factual circumstance discussed during the prosecutor's description of the elements of the crime related to the strike to the head." And the prosecutor's election "was reinforced by the defense closing" argument and the instructions—"particularly

13.

comparing and contrasting the requirements for the assault with a firearm charge and the brandishing charges." The People argue the statements by the prosecutor that defendant relies upon in his brief did not defeat the prosecutor's clear election as "the prosecutor never suggested that any element of the crime against [B.W.] [was] proven by the pointing." They further contend no election was necessary in light of the continuous course of conduct exception. That is, no unanimity instruction was necessary because the acts of hitting B.W. over the head and pointing the gun at him were "'so closely connected that they constitute[d] the same transaction and thus one offense.'" Additionally, defendant offered the same basic defense to each act; so, there was no reason to distinguish between the two acts.

Finally, the People argue any error in failing to give the unanimity instruction was harmless under both the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818— it was not reasonably probable defendant would have achieved a more favorable result— and that articulated in *Chapman v. California* (1967) 386 U.S. 18—it was harmless beyond a reasonable doubt. For the reasons that follow, we conclude a unanimity instruction was not required and, even assuming it was, the lack of such an instruction did not prejudice defendant.

Initially, we reject defendant's argument the prosecutor did not make a clear election about the theory upon which the assault with a firearm charge was based. During his opening statement, the prosecutor expressly stated the theory upon which the assault charge was based: defendant hitting B.W. over the head with a firearm. He further asserted defendant "pointed that same firearm at two *other* individuals, R.I. and [J.F.] [and] then kicked and destroyed B.W.'s bedroom door." (Italics added.) He explained to the jury it would need to determine whether defendant hit B.W. over the head with a firearm, whether he pointed the firearm at R.I. and J.F. in a threatening manner, and whether he damaged B.W.'s bedroom door for an amount less than $400. Defense counsel reiterated in her opening statement that the accusation was defendant hit

14.

B.W. over the head with a firearm. There was no mention of defendant pointing the gun at B.W. Then, in closing argument, the prosecutor tied the elements of assault with a firearm to defendant's actions in hitting B.W. over the head with a firearm to assert he was guilty of that count. He explained there did not have to be evidence the gun was loaded in this case because the People were proceeding under the theory it was used as a club or bludgeon and hitting someone in the head with a gun necessarily results in the application of force. Similarly, defense counsel argued the "main accusation" was that defendant hit B.W. over the head with a firearm. Accordingly, the prosecutor clearly elected in argument the act upon which the assault with a firearm charge was based and defense counsel reinforced this election in her arguments. (See *People v. Mayer* (2003) 108 Cal.App.4th 403, 418 [prosecutor's opening and closing arguments constituted "an election for jury unanimity purposes"]; *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1455 ["Because the prosecutor's opening argument elected what conduct by defendant amounted to the crime charged, we conclude that no unanimity instruction was required"].)

We also reject defendant's contention the prosecutor's clear election was undermined by other statements the prosecutor made to the jury during argument. Specifically, the prosecutor's comment that an assault with a firearm "is an incredibly dangerous act because all it takes for someone's life to be ended is a quick pull of the trigger," in no way directed the jury to convict defendant of assault with a firearm based on the alleged pointing of the gun at B.W. And neither counsel argued the jury could convict defendant of count 1 based on defendant's alleged pointing of a gun at B.W., nor did the jury instructions suggest this as a possible theory to support such a conviction. In addition, neither counsel asserted the gun was loaded, which would be a necessary element for conviction of count 1 under the alternative theory of pointing a gun at B.W. Rather, considering the prosecutor's clear election, we cannot conclude the court erred in failing to sua sponte instruct the jury on unanimity. (See *People v. Wilson* (2020) 56

15.

Cal.App.5th 128, 162 [by making an election in closing argument, "prosecution negated the need for a unanimity instruction"].)

Irrespective, even if we assumed, arguendo, the trial court erred in failing to sua sponte instruct the jury with a unanimity instruction, we conclude the assumed error would be harmless beyond a reasonable doubt. Defendant's defense to all the alleged crimes was to challenge the credibility and reliability of the eyewitnesses' testimony and deny the incident occurred. The jury's verdict reflects it did not believe the only defense offered—that the victims were not credible. (See *People v. Jennings*, *supra*, 50 Cal.4th at p. 679 ["There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime"].) Thus, there is not a reasonable possibility the verdict would have been different if the jury had been instructed on unanimity. Said differently, on the record before us, we cannot conceive of a reasonable possibility any juror credited B.W.'s testimony that defendant pointed a gun at him, concluded the gun was loaded when defendant pointed it at him, but then rejected B.W.'s testimony and consistent statements along with J.F.'s corroborating statements that defendant hit B.W. over the head with a firearm during the same incident. (See *People v. Napoles* (2002) 104 Cal.App.4th 108, 119 ["The erroneous failure to give a unanimity instruction is harmless if disagreement among the jurors concerning the different specific acts proved is not reasonably possible"].) Defendant's contention the jury could have reasonably believed the pointing of the gun at B.W. occurred but the bludgeoning with the gun did not occur in light of the alleged "weak" and "contradictory" evidence B.W. suffered an injury does not persuade us otherwise. There was no injury requirement to prove this charge. (See generally CALCRIM No. 875 [assault with a deadly weapon instruction providing "No one needs to actually have been injured by defendant's act"]; *People v. Jones* (1990) 51 Cal.3d 294, 307 [noting cases have found harmless error where record indicates jury resolved basic credibility dispute against defendant and would have convicted him of any of the various offenses shown by the

16.

evidence].)  In summary, based on counsel's arguments, the jury instructions, the prosecution evidence, and the defense offered at trial, we conclude any error by the trial court in failing to instruct the jury sua sponte with a unanimity instruction was harmless beyond a reasonable doubt.  (See generally *People v. Hernandez*, *supra*, 217 Cal.App.4th at p. 576 [noting split of opinion in appellate courts as to whether harmless error standard of *Chapman* or *Watson* applies in a unanimity instruction case].)

Defendant's reliance upon *People v. Davis* (2005) 36 Cal.4th 510 and *People v. King* (1991) 231 Cal.App.3d 493 is misplaced.  In *Davis*, the California Supreme Court concluded the trial court erred by failing to give a unanimity instruction regarding a robbery charge involving the named victim.  (*Davis*, at p. 560.)  The court reasoned, the evidence disclosed two distinct takings—the taking of a car from two people (one was the named victim who was a passenger in the car but not the owner of it), and the taking of one of the named victim's rings from her person.  (*Id*. at p. 561.)  The *Davis* court concluded the omission of the unanimity instruction was prejudicial as to the robbery conviction because it was unclear whether some jurors convicted the defendant based on the taking of the rings versus the taking of the car.  (*Id*. at p. 562.)  It rejected the People's contention that the takings were so closely connected as to form one continuous transaction such that it would have been inconceivable for a juror to believe the defendant committed one robbery, but disbelieve he committed the other.  (*Ibid.*)  The *Davis* court reasoned, the potential defenses to the two acts of robbery were entirely different:  as to the car, the defense was the named victim was not legally in possession of it; as to the rings, the defense was that the taking constituted only the lesser included crime of theft because it occurred after the named victim's death.  (*Ibid.*)  The *Davis* court thus concluded it could not be said "no juror could have believed defendant committed one act but disbelieved that he committed the other," as in a case where the same defense is offered to both acts constituting the charged crime.  Notably, in *Davis*, the defenses to the distinct acts supporting the charged crime were "entirely different."  (*Davis*, at p. 562.)

17.

Unlike in *Davis*, here defendant offered the same defense to both acts he alleges could have formed the basis of the assault with a firearm charge (count 1). Indeed, he offered the same defense to all the crimes—he challenged the credibility of the victims and whether the incident had occurred. The jury's verdict makes it clear this defense was rejected. Accordingly, in contrast to *Davis*, on the record before us, no juror could have believed defendant committed one act—pointing a loaded gun at B.W.—but disbelieved he committed the other—hitting B.W. over the head with a firearm. (See *Davis*, *supra*, 36 Cal.4th at p. 562.)

In *People v. King*, *supra*, 231 Cal.App.3d 493, the defendant was convicted, in part, of possession of methamphetamine for purpose of sale after the drug was found in different locations in her residence—in a purse found in the living room, in a syringe in that purse, and in a bag concealed inside a statue in the kitchen. (*Id*. at p. 498.) The defense presented evidence and argument the methamphetamine found in the purse belonged to another woman who was detained after attempting to flee the scene, and the methamphetamine in the kitchen belonged to the defendant's boyfriend. (*Id*. at pp. 497–499.) Accordingly, "there was conflicting evidence concerning ownership of the statue and its contents and reasonable inferences could be drawn that appellant did not have knowledge of or possession and control over the purse." (*Id*. at p. 500.) The *King* court concluded it was possible a portion of the jury believed the defendant possessed only the statue and its contents and the balance of the jury believed the defendant only possessed the purse and its contents. Thus, without the unanimity instruction, there was no way to be sure the verdict was unanimous as to a particular criminal act. (*Ibid*.) The *King* court held a unanimity instruction was required because "there was a separation of the contraband by space and there was conflicting evidence as to the ownership of the narcotics themselves." (*Id*. at p. 501.) But this holding does not apply to the circumstances here because this is not a possession case related to contraband found in different places against which the defendant raised different defenses. Thus, *King* is

inapposite. Rather, the circumstances here establish a unanimity instruction was not required and, irrespective, the failure to give such an instruction was harmless under any standard.

## II.     Ineffective Assistance of Counsel

Defendant next argues his counsel provided ineffective assistance by failing to object to prosecutorial misconduct or by failing to request a unanimity instruction after the purported misconduct during closing argument. We disagree.

### A.     Standard of Review and Applicable Law

A defendant claiming ineffective assistance of counsel must satisfy the two-part test of *Strickland v. Washington* requiring a showing of counsel's deficient performance and prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Id.* at p. 688.)

In evaluating trial counsel's actions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland*, *supra*, 466 U.S. at p. 689; see *People v. Dennis* (1998) 17 Cal.4th 468, 541.) Thus, a defendant must overcome the presumption the challenged action might be considered sound trial strategy under the circumstances. (*Strickland*, *supra*, at p. 689; *Dennis*, *supra*, at p. 541.) "Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.)

The prejudice prong requires a defendant to establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*)

19.

On direct appeal, when no explanation for counsel's conduct can be found in the record, "we must reject the claim [of ineffective assistance of counsel] on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053.)

**B.     Analysis**

Defendant asserts his counsel was ineffective in failing to object to the prosecutor describing aiming the gun at B.W. as assault with a deadly weapon.  He argues the prosecutor argued in closing argument that assault with a firearm can be based on the gun as an object that shoots projectiles; thus, he violated his explicit promise to make an election regarding the act forming the basis of count 1.  Defendant again emphasizes the following passage from the prosecutor's closing argument:

> "'The defendant assaulted [B.W.] with a firearm.  What does our common sense and experience tell us about assaulting with a firearm?  That it's traumatic.  It is an incredibly dangerous act because all it takes for someone's life to be ended is a quick pull of the trigger, could be a second.  So common sense tells us that the victims would be traumatized in this case.  Their behavior would show by what they saw, and that's what happened.…

> "'Every single witness that came, neighbors, officers, 9-1-1 call, you heard everyone was crying.  Everyone was upset.  Everyone was shaking.  [Lorenzo M.] said that [J.F.] and [B.W.] looked like they were about to cry.  [R.I.] and [Mary G.] used these words interchangeably, but they either said that [J.F.] was crying.  He was shaking.  [Mary G.] said that he was pale and he was startled.  This is how much of a traumatic incident it was that they were assaulted with a firearm.  You can't fake this.'"

He argues the prosecutor very clearly describes the dangerous act as being able to end a life through the pull of a trigger and the prosecutor further argued in closing, "'[B.W.] came out, he got pointed a gun.  He got surprised.  Well, he got angry, got very upset, got very upset [R.I.] got pointed at a gun….'"  He contends there was no tactical reason for defense counsel to not object to the prosecutor's misconduct based upon a violation of the

20.

explicit promise to elect a theory of guilt. Again, we disagree with defendant's contentions and conclude defendant has not met his burden of establishing ineffective assistance of counsel.

As discussed, our review of the record indicates the prosecutor made a clear election in opening and closing argument regarding the theory upon which the assault with a firearm charge was based. And, contrary to defendant's argument, we conclude the referenced excerpt of the prosecutor's closing argument in context did not urge the jury to convict defendant of assault with a firearm based upon defendant's pointing of a firearm at B.W. Rather, in closing argument the prosecutor explicitly tied the elements of assault with a firearm to the use of the firearm as a bludgeon when defendant hit B.W. in the head with it; he only presented the jury with that theory of guilt in the opening statement. Accordingly, we cannot conclude the challenged statements constituted misconduct or that defense counsel's failure to object to the challenged statements fell below an objective standard of reasonable performance. Defense counsel could have reasonably concluded the prosecutor's statements did not amount to misconduct and that objections would be futile. (See *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections"].)

Moreover, a claim of ineffective assistance of counsel can be disposed of without inquiry into counsel's possible tactical reasons for his or her actions if the reviewing court can determine that even if there was attorney error it was not prejudicial. (*People v. Kipp* (1998) 18 Cal.4th 349, 366–367; *Strickland*, *supra*, 466 U.S. at p. 697.) Here, we conclude it is not reasonably probable defendant would have obtained a more favorable verdict if defense counsel had objected to the referenced argument. That is, "[h]aving reviewed the record with respect to each of the instances of alleged misconduct, we are persuaded that there is not a reasonable likelihood that any of the challenged comments might have been misconstrued by the jurors." (*People v. Noguera* (1992) 4 Cal.4th 599, 638–639.) Additionally, the jury's verdict reflects it necessarily resolved the credibility

dispute against defendant. And, as discussed, it is not reasonably probable the jury would have convicted defendant of assault with a firearm upon B.W. based on the pointing of the gun at him without also concluding defendant had used the firearm as a bludgeon against B.W. since the only evidence the firearm was loaded came from B.W.'s testimony regarding its weight when it hit him. Consequently, defendant has failed to meet his burden of establishing he was prejudiced by defense counsel's alleged ineffectiveness.

For all of the above reasons, we reject defendant's contention.

## III.     Cumulative Error

Defendant argues the cumulation of the errors in this case prejudiced him. Here, however, there is no series of prejudicial errors to cumulate. Accordingly, defendant cannot demonstrate the cumulative effect of the alleged errors resulted in prejudice. (See *In re Reno* (2012) 55 Cal.4th 428, 483 ["claims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate"].)

**DISPOSITION**

We affirm the judgment.


PEÑA, J.

WE CONCUR:



DETJEN, Acting P. J.



SMITH, J.

22.